## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| CHARLES PAYAN,<br><br>    Plaintiff,<br>  v.<br><br>UNITED PARCEL SERVICE, and CHARLES MARTINEZ,<br><br>    Defendants. | **ORDER AND MEMORANDUM DECISION GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>Case No. 2:14-cv-00400-JNP<br><br>Judge Jill N. Parrish |

Before the court is a motion for summary judgment filed by United Parcel Service ("UPS") and Charles Martinez. (Docket 49). The court held oral argument on the motions on May 3, 2016. At the conclusion of the hearing, the court took the motions under advisement. After considering the written submissions and the arguments presented at the hearing, the court issues this Memorandum Decision and Order Granting Defendants' Motion for Summary Judgment.

## INTRODUCTION

Charles Payan brings this action against UPS and Charles Martinez. Payan, who is Hispanic, claims that his employer and Martinez discriminated against him on the basis of his race and national origin, created a hostile work environment, and retaliated against him in response to his efforts to report the discrimination in violation of Title VII and 42 U.S.C. § 1981. Payan alleges that when Martinez, who is also a Hispanic, became his immediate supervisor, Martinez downgraded his promotion status from "ready now" to a lower status that precluded him from consideration for promotions. In addition, Payan asserts he was singled out and demeaned by Martinez even though his objective measures of success were higher than his peers. Finally, Payan asserts that his placement on a Management Performance Improvement Plan

(MPIP) and his later transfer to a Business Manager position constitute retaliation for his complaints regarding Martinez's alleged discrimination. Payan also asserts claims of breach of contract, breach of the implied covenant of good faith and fair dealing, and wrongful termination in violation of Utah public policy. All of these claims similarly arise from the conduct of Martinez and UPS's response to Payan's complaints.

Defendants UPS and Martinez have moved for summary judgment arguing that Payan has failed to produce evidence sufficient to support any of his claims. They assert that UPS and Martinez did not engage in discrimination, create a hostile work environment, or retaliate against Payan. Specifically, they argue that Payan has identified no admissible evidence indicating that he was subjected to racial animus or a hostile work environment. Defendants additionally argue that Payan cannot show a causal connection between any protected activities and his placement on a MPIP or later transfer to a Business Manager position. Defendants further argue that even if Payan could show a causal connection, placement on a MPIP and lateral transfer with an increase in pay do not qualify as adverse employment actions. With regard to Payan's state law claims, defendants argue that that there was no employment contract and that, in any event, his continued employment with UPS forecloses his breach of contract and wrongful termination claims. For the reasons explained below, Defendants' motion is GRANTED.

## BACKGROUND

The following facts are, unless otherwise noted, undisputed by the parties to these motions and are construed in the light most favorable to Payan.

Payan, who is Hispanic, has a bachelor's degree in Criminal Justice and a master's degree in Business Administration. He began working for UPS in 1991 and has worked primarily at UPS's Salt Lake City facility. In 2001, he was promoted to the position of Security Supervisor and in 2006, he was promoted to the position of Security Manager.

Martinez worked at UPS from 1979 until his retirement in 2015. During the time period relevant to this matter, Martinez worked primarily in the Company's Phoenix, Arizona, facility. Around 1990, Martinez was promoted to a Security Manager position and in 2000, he was promoted to a Security Director position. Like Payan, Martinez is Hispanic.

Around November 2009, Martinez became responsible for supervising UPS's Great Basin District, which encompassed the Company's Salt Lake City security office. In this capacity, Martinez was Payan's direct supervisor. Martinez also supervised other Security Managers in the District. One of Martinez's responsibilities was to conduct Payan's employee evaluations. When Martinez became Payan's direct supervisor, Payan was rated a "Ready Now" candidate with respect to promotion, a status he had for several years. Despite having supervised Payan for only part of 2009, Martinez was responsible for conducting Payan's evaluation for the full year. In his evaluation, Martinez downgraded Payan from the "ready now" status with respect to promotion to a "retain at current" level status. Martinez's explanation for downgrading Payan's status was based on his subjective perception that Payan was a "fair performer" who "needed to grow and develop his skills and leadership" before he would be ready for a promotion.

This change in eligibility for promotion status was communicated to Payan in early 2010 and reflected in UPS's system in October 2010. Martinez continued to rate Payan's promotion status as "retain at current level" throughout his tenure as Payan's supervisor. This status indicates that an employee needs more time to develop before he may be promoted. After Payan's status was downgraded, two UPS employees were promoted to Security Division Manager. Mr. Payan's qualifications are similar, although not identical, to the qualifications of the individuals who received these promotions.

UPS supervisors conduct a Quarterly Performance Review (QPR) twice a year to evaluate their employees. The QPR has two components. The first is an objective component made up of measureable elements of an employee's work, including how packages are delivered, processed, and sorted, as well as volume, revenue, and claims. The second component of the QPR is a leadership competency assessment. The results of a QPR impact annual salary increases and opportunities for promotion. Payan's objective performance numbers were among the best in the area, but Martinez focused on Payan's alleged deficiencies in the subjective aspects of his job performance. For example, Payan's 2009 QPR indicated that he was at 106% in his goal results, but Martinez nonetheless gave him a .58 out of 1 rating on the Leadership Competency Assessment. Martinez persistently made efforts to instruct Payan regarding his deficiencies in the less tangible areas of his job performance. Payan perceived Martinez's critical feedback regarding the subjective aspects of his leadership and job performance as unwarranted and intended to be harassing and discriminatory.

In contrast to Martinez's assessment, Mr. Payan rated himself a 1 with respect to leadership competency, and his co-workers assessed him at mostly above 1, meaning they perceived Payan to be performing higher than expected.

Payan believed that Martinez felt threatened by the prospect that Payan might take Martinez's job. And Payan believed this to be a motivation for Martinez's race or national origin based discrimination. Payan asserts that Martinez was constantly harassing him. Payan documented hundreds of pages of interactions with Martinez that he alleges involved harassment. Yet the only instances of harassment that he alleges overtly involved his race or national origin are recounted as follows. First, on one occasion, Martinez and Payan had a heated conversation during which Martinez indicated that Payan had an integrity issue and called him a

4

kid who doesn't even speak Spanish. Second, Payan asserts that Martinez would often correct his pronunciation of Hispanic surnames. Finally, Payan points to Martinez's friendship with another Hispanic manager who speaks fluent Spanish as evidence of Martinez's racial animus towards Payan. One of Martinez's best friends growing up was a Cuban-American, and Martinez expressed his fondness for the Cuban accent of the other Hispanic manager.

In 2010, Payan contacted Human Resources Manager Carl Wesley to discuss his concern that Martinez was discriminating against him on the basis of his race. Wesley worked down the hall from Martinez in UPS's Phoenix office. Wesley was good friends with Martinez and the two socialized together outside of work. Payan raised the issue of his poor performance evaluation with Wesley, and Wesley acknowledged that the conflict between Payan's objective numbers and Martinez's rating were a cause for concern. In light of his continuing concerns about racial discrimination, Payan filed a complaint with UPS Human Resources in February 2012. Wesley assigned Payan's complaint to Human Resources Operations Manager Darren Moore and Area Manager Carolee Streeper to investigate Payan's complaint. Payan continued to object to Martinez's conduct throughout 2012 and 2013. UPS investigated Payan's claims but determined that Martinez had neither discriminated against nor harassed Payan. Following this investigation, UPS initiated a meeting between Payan and Martinez in an effort to clear the air. UPS also offered Payan an opportunity to participate in the Company's Employee Dispute Resolution process, but Payan declined. During this timeframe, in 2012, Wesley had a discussion with Martinez regarding Payan. Following this discussion, Martinez decided to document the perceived performance issues intertwined with Payan's complaints to Human Resources. Ultimately, Martinez recommended to Wesley that Payan be transferred and not retained at his

current management level. As a basis for his recommendation, Martinez pointed to perceived integrity and communications issues.

In response to Martinez's recommendations, UPS put Payan through a Management Performance Improvement Process (MPIP). At UPS, the purpose of an MPIP is to help employees who are not performing well go through a formalized training with their manager to help them improve their skill sets and enable them to perform more effectively and eliminate their deficiencies. UPS tasked Payan with improving his communication, organization, and development of subordinates. Because each of the MPIP goals involved subjective critieria, Payan refused to agree to the goals he was required to meet. On the same day he was placed on the MPIP, he made another formal complaint to Human Resources through a UPS hotline.

As part of the MPIP, Payan had to meet with Martinez and UPS Human Resources to track Payan's progress and efforts to improve. These meetings took place in November 2012 and January, February, and March 2013. After his second MPIP review, UPS determined that Payan was not satisfying the plan requirements. Shortly thereafter, Payan filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). In his complaint, Payan alleged that he was subject to harassing and degrading behavior from Martinez on the basis of his race, that UPS had retaliated against him by placing him on an MPIP in response to his complaints to Human Resources, and that UPS was giving better pay raises to other employees. The EEOC ultimately dismissed Payan's charge of discrimination with a finding of no probable cause and issued him a right-to-sue letter.

At the conclusion of his MPIP in October 2013, UPS transferred Payan to a Business Manager position in the operations department. In his new position, Payan had the same management authority and continued to lead his own team of employees. As a result of the

transfer, Payan's pay increased. Payan was not required to change work locations, and he is no longer supervised by Martinez. But Payan perceived this to be a punishment for his complaints to Human Resources, and another UPS employee testified that transfers to the operations department are perceived by security employees to be a punishment.

UPS has a strong anti-retaliation policy that is impressed upon employees because it is important to UPS to assure its employees that they will be protected if they raise concerns with Human Resources. This policy is found in both UPS's Code of Conduct and Policy Book. UPS's Code of Conduct explains that employees cannot "be retaliated against in any way for asking questions or voicing concerns about our legal or ethical obligations when acting in 'good faith.' Good Faith does not mean an individual has to be right, but it does mean the individual must believe that the information provided is truthful." UPS's Code of Conduct contains a disclaimer in small print on the final page of its handbook stating that the "Code of Business Conduct is not an express or implied contract of employment and does not create any contractual right of any kind between UPS and its employees. In addition, all employees should understand the Code does not modify their employment relationship, whether at will or governed by contract." The Policy Book similarly contains a disclaimer that provides: "The *Policy Book* is not a contract of employment and does not guarantee employment for any particular period of time, or otherwise create any rights as an employee of UPS." The Policy Book also states, "[a]s individuals, we do not have the authority to change or disregard any of our company's policies. We are expected to follow existing policies, even if we are not always in complete agreement with them. Our managers and supervisors are expected to lead the way for other UPS people – by word and action—to adhere to our policies." The anti-retaliation policy in the Policy Book states "[w]e will not retaliate against an employee acting in 'good faith.' Good faith does not mean that an

individual has to be right it does mean that the individual must believe that the information

provided is truthful." Payan signed an acknowledgment that nothing "in any Company handbook

manual, rule, regulation, practice or policy creates an employment contract, express or implied

between myself and the Company." Payan also signed UPS's anti-retaliation policy, which

provides "[o]ur commitment to integrity includes a responsibility to foster an environment that

allows our people to report violations without the fear of retaliation or retribution . . . . Anyone

who retaliates against another employee for reporting known or suspected violations of our legal

or ethical obligations is in violation of the Code and subject to disciplinary action, up to and

including dismissal."

Payan filed the current lawsuit against UPS in May 2014. Payan's complaint alleged

hostile work environment, disparate treatment, and retaliation claims relating to Martinez's

alleged racial discrimination and the response by UPS's Human Resources Department.

Martinez's complaint also alleges state law claims for breach of contract, breach of the covenant

of good faith and fair dealing, and violation of Utah public policy.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "A fact is material if, under the governing law, it could have an effect on the

outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in

favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction

Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206,

1215 (10th Cir. 2013)). On a motion for summary judgment, the court "consider[s] the evidence

in the light most favorable to the non-moving party." *Conroy v. Vilsack*, 707 F.3d 1163, 1170

(10th Cir. 2013) (quoting *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1037 (10th Cir. 2011)).

However, "[w]hen the moving party has carried its burden, . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quotations and citations omitted).

**ANALYSIS[1]**

Payan alleges claims of race discrimination in violation of Title VII and 42 U.S.C. § 1981 against all defendants. He also asserts claims of retaliation in violation of Title VII and 42 U.S.C. § 1981 against all defendants. Finally, he alleges state law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and a violation of Utah public policy. The court will address each claim in turn.

## I.   Hostile Work Environment Claims under Title VII and § 1981

"To survive summary judgment, a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . [and] must also produce evidence from which a rational jury could infer that []he was targeted for harassment because of h[is] gender, race, or national origin." *Sandoval v. City of Boulder*, 388 F.3d 1312, 1326–27 (10th Cir. 2007) (quoting *O'Shea v. Yellow Tech. Servs.*, 185 F.3d 1093, 1098 (10th Cir. 1999)). The court addresses each issue in turn.

---

[1] The elements of discrimination claims are identical under Title VII and § 1981. *See, e.g.*, *Prabhakar v. C.R. England, Inc.*, No. 2:12-CV-881-TS, 2013 WL 5408539, at *4 (D. Utah Sept. 25, 2013) (*citing Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008)). Accordingly, with respect to each variation of Payan's discrimination claims, the court addresses the merits of the Title VII and § 1981 claims together.

Payan has come forward with insufficient admissible evidence to demonstrate harassment that was sufficiently severe or pervasive to satisfy the first element of a hostile work environment claim. "Title VII does not establish 'a general civility code' for the workplace." *Morris v. City of Colo. Springs*, 666 F.3d 654, 663–64 (10th Cir. 2012) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (internal citations omitted). "Accordingly, the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Id.* at 664. While the "severity and pervasiveness evaluation [of a hostile work environment claim] is particularly unsuited for summary judgment because it is quintessentially a question of fact" the Tenth Circuit has often "affirmed the resolution of this issue at the summary judgment stage." *McElroy v. Am. Family Ins.*, 630 Fed. App'x 847, 849 (10th Cir. 2015) (quoting *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 958 (10th Cir. 2012)) (alteration in original).

 To survive summary judgment Payan "must show that the environment was both objectively and subjectively hostile or abusive." *Morris*, 666 F.3d at 664 (quoting *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998)). The court assesses "the objective severity of the harassment from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* (quoting *Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007)). These circumstances must be viewed in their totality and include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Chavez v. New Mexico*, 397 F.3d 826, 832–33 (10th Cir. 2005)). The court must carefully consider "the social context in which particular behavior occurs and is experienced by its target." *Id.* (quoting *Oncale*, 523 U.S. at 81)). "Conduct which is considered

normal and appropriate in one setting may be deemed abusive or hostile in another." *Id.* (quoting *EEOC v. Fairbrook Med. Clinic, PA*, 609 F.3d 320, 328 (4th Cir. 2010)). "Furthermore, 'if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.'" *Id.* at 665 (quoting *Harris v. Forklift Sys., Inc.*, 510 US. 17, 21–22 (1993)). Nonetheless, the law does not require a showing of tangible impairment in work performance or a serious effect on the plaintiff's psychological well-being. *Id.*

While Payan has produced evidence that he subjectively perceived his work environment to be hostile and abusive, he has not come forward with any admissible evidence of an objectively severe or pervasive hostile work environment. In his opposition to summary judgment, Payan relied almost exclusively on the hundreds of pages of handwritten notes documenting his interactions with Martinez. But Payan made absolutely no effort to demonstrate how these notes would be admissible at trial. At this stage of the proceedings, Payan must be able to support each element of his claims with admissible evidence.  *See, e.g.*, *Chestand v. Med. Tech. and Research Auth.*, 216 F.3d 1086, at *2 (10th Cir. 2000) (unpublished) (affirming an award of summary judgment dismissing a Title VII claim for race discrimination where the plaintiff relied on inadmissible hearsay in its opposition to summary judgment). UPS properly objected to the court's consideration of the notes on hearsay grounds in its reply. And Payan failed to address, in either a request for surreply or at oral argument, what if any exception to the hearsay rule might allow his notes to be admissible at trial. Outside of these notes, Payan offered only a few examples of alleged harassment in his deposition. And each of these instances at most amounted to "run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces [and] is not the stuff of a Title VII hostile work environment claim."

*Morris*, 666 F.3d at 664. Accordingly, the court holds that Plaintiff has failed to come forward with admissible evidence to show that he was subject to severe or pervasive workplace harassment.

Payan has also failed to show that any harassment was because of his race or national origin. *See Sandoval*, 388 F.3d at 1326–27 (quoting *O'Shea*, 185 F.3d at 1098). Despite the years of alleged harassment, Payan can point to no evidence suggestung that Martinez targeted him because of his race or national origin. Martinez's comment during a heated exchange that Payan was a kid who didn't speak Spanish and Martinez's habit of correcting Payan's pronunciation of Spanish names is at most tangentially related to Payan's race or national origin. And the fact that Martinez was good friends with another Cuban-American supervisor does little to raise an inference of discrimination. Criticizing an employee's poor Spanish pronunciation or inability to speak Spanish does not evidence animus based on an individual's race or national origin. The law provides no special protection for discrimination based on one's poor grasp of a particular language. And absent additional evidence, it is entirely speculative whether or not Martinez's criticism of Payan's Spanish is at all related to his race or national origin. The fact that Martinez was fond of the Cuban-American Supervisor's fluent Spanish and accent does nothing to advance Payan's theory. There is no basis for a jury to determine that the allegedly differential treatment was based on race/national origin as compared to language proficiency. Evidence that Martinez criticized Payan because of his Spanish but did not criticize the poor Spanish of non-Hispanic co-workers might raise an inference that the criticism was based on Payan's race or national origin. But there is no such evidence. Taking all of the evidence in its totality, a rational jury could not infer that Martinez targeted Payan because of his race or national origin. And the court notes, that its analysis of this factor would not change even if Payan's handwritten notes

were admissible because nothing in the notes ties the alleged discrimination to Payan's race or national origin.

## II.       Disparate Treatment Race Discrimination under Title VII and § 1981

The court addresses Payan's disparate treatment claims under Title VII and § 1981 in three parts. While the substantive elements of these claims are identical, Title VII and § 1981 have differing requirements relating to the timing and procedures for bringing a claim in federal court. The court therefore first addresses the procedural and timeliness issues relating to Payan's Title VII claim, then the timeliness of Payan's § 1981 claim, and then jointly the merits of both the Title VII and § 1981 claims.

### A.       Procedural and Timeliness Issues Relating to Payan's Title VII Claim.

For the reasons that follow, the court concludes that Payan both failed to exhaust his administrative remedies and likewise failed to timely file his EEOC charge of discrimination. The court addresses each issue in turn.

"It is well-established that Title VII requires a plaintiff to exhaust his or her administrative remedies before filing suit." *Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005). Exhaustion of administrative remedies "is a jurisdictional prerequisite to suit under Title VII." *Id.* Whether a party has exhausted administrative remedies is a "question of jurisdictional fact." *McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1105 (10th Cir. 2002). But if the issue is clear as a matter of law after consideration of the parties' briefs and the material attached for the court's review, the court may decide the issue on summary judgment. *See A.F. ex rel Christine B. v. Espanola Public Schs.*, 801 F.3d 1245, 1250 (10th Cir. 2015). As the party seeking federal court jurisdiction, Payan bears the burden "to show, by competent evidence, that [he] did exhaust." *Id.* at 1106.

Here, Payan's complaint to the EEOC complains of his placement on the MPIP and alleges that his non-Hispanic co-workers received better pay raises than he had. But it does not allege that the downgrading of his performance rating was discriminatory. In fact it fails to mention this issue at all. Moreover, Payan does not complain—as he does now—that he was improperly passed over for promotion. Accordingly, the court finds that Payan has failed to exhaust administrative remedies with respect to his claims arising from the downgrading of his employment rating.

Even if Payan's EEOC charge can be read to include his claim for his downgraded status, the EEOC charge was filed too late if he intended to challenge the 2010 downgrading that occurred in connection with his performance review. A charge of discrimination must be filed within 300 days of the alleged discriminatory act. *See, e.g.*, 42 U.S.C. § 2000e–5(e); *Matthews v. Kennecott Utah Copper Corp.*, 54 f. Supp. 2d 1067, 1073 (D. Utah 1999). While Payan asserts that allegations of a "series of separate acts that collectively constitute one 'unlawful employment practice'" need only have one of the separate acts occur within the limitations period, this applies only to hostile work environment claims. *See Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1138 (10th Cir. 2008) ("In the context of suits based on discrete acts, a court may easily determine whether the plaintiff filed a claim within the limitations period. As the Supreme Court noted in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002), discrete acts 'occur[] on the day that [they] happen[].' 'As applied to hostile environment claims, however, [the 300-day] requirement has proven problematic, *Duncan* [*v. Manager, Department of Safety, City & County of Denver*, 397 F.3d 1300, 1308 (10th Cir. 2005)], because '[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice.' *Morgan*, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e–5(e)(1))."

(fifth alteration not in original, all others in original)). For his disparate treatment claim to be timely, Payan must have filed his complaint within 300 days of his change of promotion status. He did not do so. The change in his performance rating came in 2010 and he did not file his EEOC charge until 2013. Accordingly, the court finds that Payan's EEOC charge both failed to raise the issue of his downgraded status and was filed too late. For these reasons the court dismisses Payan's Title VII disparate treatment claim for failure to exhaust administrative remedies.

**B.      Timeliness of Payan's § 1981 disparate treatment claim.**

Payan's disparate treatment claim under § 1981 was also untimely. A § 1981 claim is subject to a four year statute of limitations. *See Cross v. The Home Depot*, 390 F.3d 1283, 1288–90 (10th Cir. 2004) (concluding that § 1981 claims relating to conduct occurring after an employee is hired are subject to a four year, as opposed to a two year, statute of limitations so long as they do not involve new contract formation). Payan's disparate treatment claim for the change in his promotion status accrued at the time his promotion status was changed. Here, Payan acknowledges he was aware of his impending status change in early 2010, but asserts that the change did not take effect until October 2010. Payan, however, fails to cite any evidence in the record that supports his claim that the status did not change at the time he was informed of it. Because the only evidence in the record, Payan's own deposition testimony, supports UPS's position that the change of status took place in early 2010, the court finds that Payan's claims filed in May 2014 are untimely.

**C.      The Merits of Payan's Title VII and § 1981 disparate treatment claims**

Under Tenth Circuit law, where a plaintiff relies on circumstantial evidence to prove a claim for race discrimination, the burden-shifting framework of *McDonnell Douglas Corp. v. Green* applies. 411 U.S. 792 (1973); *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 920 (10th

Cir. 2004) (applying the framework). Under this framework "the plaintiff must initially establish a prima facie case of discrimination." *Rivera*, 365 F.3d at 920.

If a "plaintiff establishes a prima facie case, the burden shifts to the employer 'to articulate some legitimate, nondiscriminatory reason' for its action." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). "If the employer does so, the burden shifts back to the plaintiff to show that there is a genuine issue of material fact as to whether the employer's proffered reasons are pretextual." *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007). In this case, for the reasons set forth below, the court finds that Payan has failed to establish a prima facie case. To establish a prima facie case, Payan must show "(1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was [subject to an adverse employment action] under circumstances giving rise to an inference of discrimination." *Barlow v. CR England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012) (quoting *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004)).

Payan cannot show that he was subject to an adverse action under circumstances giving rise to an inference of discrimination. Payan relies on the same evidence to satisfy the third prong of this claim as he did to support his claim for a hostile work environment. For the same reasons articulated above, the court finds that Payan has not come forward with evidence from which a reasonable jury could infer that his status was downgraded because of his race or national origin. Accordingly, the court finds that Payan has failed to establish a prima facie case of discrimination.

## III.   Retaliation under Title VII and § 1981

To establish a prima facie case of retaliation Payan must show (1) that he engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the

challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action. *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008). The court addresses each element in turn.

First, the court concludes that Payan engaged in a protected opposition to discrimination. To engage in protected opposition, the complaining employee need only have a reasonable good-faith belief that the conduct complained of violates Title VII. *Crumpacker v. Kansas Dep't of Human Resources*, 338 F.3d 1163, 1171–72 (10th Cir. 2003). Nonetheless, the employee "must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [Title VII]." *Hinds*, 23 F.3d at 1203; *McElroy*, 630 Fed. App'x at 851 (holding that the plaintiff must complain of "discriminat[ion] against him on the basis of a characteristic listed in [Title VII]"). "[A] vague reference to discrimination and harassment without any indication that this misconduct was motivated by race (or another category protected by Title VII) does not constitute protected activity and will not support a retaliation claim." *Anderson v. Acad. Sch. Dist. 20*, 122 Fed. App'x 912, 916 (10th Cir. 2004). Here, Payan frequently and persistently complained to Human Resources. Payan believed that Martinez was discriminating against him on the basis of his race or national origin. In his many complaints to Human Resources throughout the time period during which Martinez was his supervisor, Payan made clear that he believed the alleged harassing conduct was motivated by racial animus. Accordingly, the court holds that Payan has alleged sufficient facts to show protected opposition.

But Payan cannot show that he suffered an adverse employment action as a result of his protected opposition. The Tenth Circuit "liberally define[s] the phrase 'adverse employment action.' Such actions are not limited to monetary losses in the form of wages or benefits. Instead, [the Tenth Circuit] take[s] a case-by-case approach, examining the unique factors relevant to the

situation at hand." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004) (quoting *Sanchez v. Denver Public Schs.*, 164 F.3d 527, 531 (10th Cir. 1998)). Nonetheless, the Tenth Circuit does not "define 'adverse employment action' as encompassing every 'action taken by a plaintiff's employer that may affect the plaintiff's future employment opportunities.'" *Id.* at 1033 (quoting *Aquilino v. Univ. of Kan.*, 268 F.3d 930, 935 (10th Cir. 2001)). In *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), the Supreme Court held that to constitute an adverse action, "an employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 64.

Here Payan alleges adverse actions when UPS placed him on the MPIP and ultimately in transferring him to a Business Manager position. But there is no evidence that the transfer constituted an adverse employment action. In his new position, Payan retained the same management authority, he still supervised his own team of employees, and his salary increased. Payan was not required to change work locations, and he is no longer supervised by Martinez. Payan has presented no evidence to suggest that his prospects for future employment or promotion within the company have been harmed by his MPIP and transfer to a new position.

Payan argues that his transfer and his placement on the MPIP are punishment for his complaints to Human Resources. And another other long-time UPS employee agreed with Payan's assessment, testifying that transfers to the operations department are perceived by security employees to be a punishment. But these facts are not sufficient to rise to the level of an adverse action. Payan cannot identify any legal authority to support his contention that placement on a Performance Improvement Plan (PIP) qualifies as an adverse employment action. While the Tenth Circuit has not addressed the issue, after *Burlington*, several other circuits have addressed the issue and have consistently held that placement on a PIP does not rise to the level of an

adverse employment action. *See, e.g.*, *Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280, 286 (5th Cir. 2015) (unpublished) (citing *Burlington* and concluding that a PIP is not a materially adverse employment action where plaintiff continues to engage in protected activity); *Choulagh v. Holder*, 528 F. App'x 432, 438 (6th Cir. 2013) (unpublished) ("The placement on the performance improvement plan . . . do[es] not rise to the level of a materially adverse action."); *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009) (citing *Burlington* the court held that placement on a PIP was not a materially adverse action); *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 880 n.2 (8th Cir. 2014) (plaintiff's "placement on the PIP alone does not constitute an adverse employment action and cannot support her claim of retaliation"). This post-*Burlington* case law from other circuits is consistent with the Tenth Circuit's holding pre-*Burlington*. *See Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1224 (10th Cir. 2006) ("Most courts that have considered whether a PIP, standing alone, is an adverse employment action have found it is not").

Further, the Tenth Circuit has held that where a reassignment "involved no hardship to the plaintiff other than a requirement to develop new skills," there had been no adverse employment action. *See Hillig*, 381 F.3d at 1033 (citing *Tran v. Trustees of the State Colleges in Colo.*, 355 F.3d 1263 (10th Cir. 2004)). Likewise, Payan's and his co-worker's subjective perceptions of the meaning of a transfer to another department does not satisfy the standard for showing an adverse action. In *McGowan v. City of Eufala*, 472 F.3d 736 (10th Cir. 2006), the Tenth Circuit found no adverse employment action where an employer denied a request for reassignment where the new shift "offered no differences in pay and benefits" and was not "more arduous." *Id.* at 742–43. While the plaintiff had a "subjective preference" for the reassignment, the Tenth Circuit held this was insufficient to render the reassignment an adverse action. Ultimately, the court concludes that Payan has failed to identify sufficient evidence to

demonstrate that the reassignment would dissuade a reasonable employee from engaging in protected opposition. Accordingly, the court concludes that Payan has failed to show he suffered an adverse action.

With respect to the final element, the court concludes there is sufficient evidence from which a jury could find a causal connection between the protected opposition and the alleged adverse action. While the court has concluded that there was in fact no adverse action in the case, there are facts to support a causal connection between Payan's ongoing complaints to Human Resources regarding Martinez and his placement on the MPIP and Payan's ultimate transfer to Business Operations. Wesley communicated with Martinez regarding Payan's complaints and Martinez asserted that Payan's complaints were tied to his alleged poor performance. The ongoing communication and involvement of Wesley and Martinez in both Payan's complaints to Human Resources and the decision to place him on an MPIP and ultimately transfer him to Business Operations establish sufficient evidence from which a jury could conclude that Payan's protected opposition led to his MPIP and subsequent reassignment.

While the court concludes that Payan has established sufficient evidence to satisfy the first and third elements of his claim for retaliation, the court holds that Payan has failed to come forward with evidence that he suffered an adverse employment action. His claim for retaliation must therefore be dismissed.

## IV.     Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing

"The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Bair v. Axiom Design, LLC*, 20 P.3d 388, 392 (Utah 2001). In Utah, an employment relationship is presumed to be at-will. *Giusti v. Sterling Wentworth Corp.*, 201 P.3d 966, 976

(Utah 2009). When an employer intends to guarantee employment for a specified period, the employer must "make that promise clear and definite" by a manifestation "communicated to the employee and sufficiently definite to operate as a contract provision." *Id.* (quoting *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1002 (Utah 1991). "[W]hen an employee handbook contains a clear and conspicuous disclaimer of contractual liability, any other agreement terms must be construed in light of the disclaimer." *Hodgson v. Bunzl Utah, Inc.*, 844 P.2d 331, 334 (Utah 1992).

Here, the record is replete with notices both received and acknowledged by Payan making clear that he was an employee at will and did not have an employment contract with UPS. While UPS endeavored to ensure its policies were followed by employees and made this a significant part of its company culture, such conduct is not sufficient to create a contract under Utah law. Because Payan had no employment contract with UPS, the court dismisses his breach of contract claim.

The court next turns to Payan's claim for breach of the implied covenant of good faith and fair dealing. "[T]o find a breach of the duty of good faith and fair dealing, there must be some type of preexisting contractual relationship." *Andreini v. Hultgren*, 860 P.2d 916, 921 (Utah 1993). Because there was no employment contract between UPS and Payan, UPS could not have breached the covenant of good faith and fair dealing. Accordingly the defendants are entitled to summary judgment on Payan's claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

**V.      Violation of Utah Public Policy**

Because Payan is still employed by UPS, he concedes that he does not have a claim for a

violation of Utah public policy. Such a claim requires an employee be terminated. The court

therefore dismisses this claim.

## CONCLUSION

For the foregoing reasons, Payan's claims fail as a matter of law and the court therefore

GRANTS Defendants' motion for summary judgment.

Dated September 29, 2016.

BY THE COURT:

_____
Judge Jill N. Parrish
United States District Court